May it please the Court, I'm John Lindrum, appearing here on behalf of the patent owner, Susan McKnight, Inc., and we are seeking a reversal of a decision from the Patent and in conjunction with an IPR. They held all the claims of the patent invalid, and we feel that there are numerous errors that are not supported by substantial evidence in the case, and that there are frequent instances where they're actually drawing upon the 917 patent, that's the patent in suit here, by way of hindsight, to fill in some of the gaps in the prior art. First of all, the patent deals here with a very unique type of bed bug trap, and this is not esoteric, not high tech and stuff like that, but it's a very simple structure that enables the trap to discriminate between bed bugs that are located in one area of the bed that's infested, and another trap that enables the detection of the bed bugs that are in the bed, and specifically, the two areas of the trap are made up with pitfall traps, that's where the bed bugs fall into the traps, and those traps are not replicated in any of the art. Your traps, and one of the reasons you say is because the sides are smooth, the bed bugs can't get out. Can I just ask you a fundamental question? I mean, I think one of the arguments you say this invented is worthwhile, because then the consumer, whoever lives in the house, can kind of figure out where the source of the bed bug problem is coming from. Can I just ask you an ignorant question, which is, if the bed bugs are coming from the leg of the bed, and they can't get out on the sides because they're smooth, why wouldn't they just claim that climb back up the leg and get to their victims, which are the people sleeping in the bed? So, and if that's the case, then wouldn't it defeat your notion that, well, people will be able to ascertain which big bed bugs, if any, are coming from the bed, if they've all gone back to bed, right? So tell me what I'm misunderstanding. That's correct, Your Honor, you're correct. They could go back up into the bed and... So how would this invention work? You're saying one of the purposes is so that someone living in the house can figure out whether the bed bugs came from somewhere else or from the bed, if, in fact, that retainer at the leg is not retaining the bed bugs and they're all going back, it's going to be empty, right? Yeah, thank you, Your Honor. It's because the habits of the bed, this trap is designed by a couple of entomologists. They are aware of the characteristics of bed bugs. Bed bugs abhor sunlight. They're nocturnal insects. They come out at night and they go and feast on the human being in the bed and then... Or the bait, as we call them. And then when they're done feasting, it takes them an hour or so, it's usually after midnight, they go back down and go back into their hiding places, their places of refuge, which are someplace in the room. This is the habit. You're correct, Your Honor, that they could turn around and go back up into the bed and try to find a hiding place there, and this trap would not connect with those type of bed bugs. But that's not their normal habit. But they're not, but you're precluding them from going to their regular places of refuge because they can't get out of these smooth walls. They can't climb up, so they've got no choice other than to stay there in the light or to climb back up in bed, right? But they don't, that's not their habit. Their habit is to go find hiding places and cracks in the walls or under the... But they can't get out, right, because that's the smooth walls. No, but that's their tendency, is to try to do that. They are trying to hide from the sunlight. They don't like... So what's the psychology of bed bugs? In the absence of their being able to go back to their hiding places, are they just going to stay on the outside or are they going to go back up the ledge? Some of them may stay, but others would remain trapped in the inner pitfall trap. If that's true, then it would seem to me that the same thing would happen if you put the bed leg into Section G of the Generich Prior Art, would it not? Because if you put the bed leg into Section G of the Generich Prior Art, wouldn't exactly the same thing happen as long as you either smoothed the edges of Section G so that the bed bugs couldn't get out of that? Wouldn't that have the same result? Are you talking about Section G being the... Of the Generich Prior Art, of Figure 5. That would happen also, it could, but the fact is there's no teaching in any of the Prior Art to put a bed leg in any trap. So that's, you think, the biggest difference between the Prior Art and your invention, is the teaching to put a bed leg into the center section, again, of say, Figure 5 of Generich? No, that's not the only difference. There are a couple of primary differences. One is there are two pitfall traps, not one, and I know the Patent Office may be discreet by that, but there's no pitfall... Well, I guess my question really is, doesn't putting the leg into Section G convert Section G into a pitfall trap of Generich? It could do that if there were teachings in the art to place the trap under the leg of the table. Yeah, but that brings us back to the first point, which is, isn't that the main difference between the Prior Art and your invention, is the idea of putting the leg into the center section? Not... Because you're saying that if you do put the leg in the center section, then the center section becomes a pitfall trap, and now you have a two pitfall trap trap. Well, no, there's a few other things, Your Honor. Okay, what are the others? The other thing is that center, that G, that doesn't have, that's not designed to capture bed bugs. That has no slippery surfaces. It does not have... Okay, that's the slippery surface argument. That's right. The slippery slope argument. Or some alternative, such as Generich teaches that he could put in what he called paralyzing powder, which is what he does put in the outer pitfall trap to keep the insects in there. But there's no teaching, the section G that you're talking about is a bait receptacle. There's no reason to have slippery surfaces there. There's no reason to have paralyzing powder in there. So, just putting the legs in would not do it because the structure, contrary to, I realize, the position of the patent office, the structure of that bait receptacle is not a pitfall trap. There's a key element missing. The finding of the PTAB was all you needed to have was vertical walls and a floor and that would define the structure. Well, I think the slick vertical walls is what they found as I understand it. The what? For the connection between the prior art, the reason that the prior art was deemed to No, I think the original finding was they assumed that the structure of two pitfall traps is already in Generich, even though he doesn't discuss it. Right. They're missing the fact that the vertical walls do not form a pitfall trap. You have to have something else like slippery surfaces or the powder to disable the climbing ability of the insects. But that was my understanding was, and correct me if this is wrong, but my understanding was that the slippery surface was an added element to Generich so that you end up with obviousness based on both the Generich structure and slippery walls. Otherwise, Generich would have been anticipated. That is correct. You have to add that. Right. But there had to be a motivation to cause the person of ordinary skill in the art to add slippery surfaces. And what we're saying is there is no motivation to do that for several reasons. One is, if you look at Generich, and again, we're starting with Generich, which I call a single pitfall trap. It has a bait receptacle in the middle. It relies upon bait to attract the insects in it. But there's no way the insects would ever reach the bait receptacle. The catching space, which is H, I think, in Generich, totally surrounds the bait receptacle. Unless you put a bed leg in the middle of the Generich structure. Yeah, but where does that suggestion come from? That comes from our patent. That's hindsight, Your Honor. That's one of the main errors in the PTAB there. There's another element that's related to that where they also relied upon hindsight. The bed or the floor of that bait receptacle was supposed to be a support leg type floor. That's a limitation in the claim. That's a structural limitation to the floor of the bait receptacle in order for the leg or the table or a chair or a bed in order to be supported in that. That doesn't come from any of the prior art. That solely comes, the teaching of making that floor a support structure, that comes entirely from the 973 patent as well. That's a second element where they rely upon hindsight to anticipate the claims and give motivation to the person of ordinary skill in the art to convert Generich into a double pitfall trap instead of a single pitfall trap, which it is. There are some other problems also with the PTAB's ruling. One of the limitations is that the trap that we claim is bait-free. They rely upon one of the yolks, not Generich. Generich works on a baited trap, that's for sure. The Jennings reference is a trap that is also a pitfall trap. It's a single pitfall trap. Again, I want to emphasize, none of the prior art has a double pitfall trap. None of the traps in the prior art have any sort of a, because they don't have double pitfall traps, they don't have the ability to discern between bed bugs in the bed versus bed bugs elsewhere in the room. You agree Jennings is slippery or polished. I agree. That does teach a slippery surface to capture traps. The problem is, let's see, I was off on the issue of bait-free. Did you want me to address this? No. Okay, okay. They're relying upon Jennings for the teaching that the trap can be bait-free. That is another error without substantial evidence to support the position because Jennings is silent on whether or not it uses traps. As you all know, patents are just written to describe the invention. They don't have to describe all the environment and everything that's around it. It consequently is improper when a patent is silent on a particular issue, such as whether bait is used or not. You cannot draw negative inferences that in fact it is bait-free. But the PTAB didn't do that. They did, in fact, draw upon Jennings and assume that it teaches a bait-free trap. That's not proper teaching and any motivation to the person who ordered their skill in the art to actually make the bait-free trap out of our device. There's also, beyond that, there's another limitation that's, well, I guess I've already covered it, is the idea that, oh, I'm running out of time here, I think I'd like at this point to reserve my time for rebuttal if I may do that, Your Honor. Thank you. Good morning, Your Honors. May it please the Court. As this Court recognized, Jenner expressly discloses every structural limitation of the claimed bed bug trap, except Jenner does not expressly disclose whether central space G's walls are smooth. The Board correctly found that a person of ordinary skill in the art would have been motivated to make those walls smooth, and the remainder of the arguments that my friend makes are directed towards intended uses, which are not sufficient to patently distinguish the claimed invention from Jennerich's trap. Turning briefly to the smooth walls, the motivation for making smooth walls, the Board found that both central space G and Ketchick space K were pitfall traps by virtue of... Doesn't the patent itself say that smooth walls are recognized in the art? Yes, that's where I was going. That's what the Board said, that this would have been an obvious design choice to in turn make these steep, deep canyons or pitfall traps that are already present in Jennerich smooth. Deep canyons if you're a bed bug. If you're a bed bug. But even so, Jennerich discloses that his traps will work for beetles and cockroaches, which I think it's common knowledge are bigger than bed bugs, and so they're deep if you're a bug, and that they will catch insects, and that making the walls smooth or adding paralyzing powder, which is not a neurotoxin or any sort of physiological... What if I'm putting a bed leg in one of the traps? That's an intended use that they're relying on, and that intended use just doesn't distinguish the structure that we have here. It's just that you could put a bed leg in there, but by the way, the claims don't require that a bed leg be in there, or they say a bed leg or another object, and the specification explains that the bed leg doesn't even have to be in there. The claims say it only needs to be capable of putting a bed leg in there, but the specification teaches us... Is there bait other than people? Well, humans just being in the room, apparently, within five feet of the trap, according to their specification, is enough to attract bed bugs, and their specification expressly teaches that you can use the claim trap with a furniture leg in it, or just near where people are. I mean, that's an express teaching in the specification. And you think that... Well, go ahead. Why don't you find the... Oh, it's just... You can continue asking, and I'll try to... You can help me. Okay. Go ahead. I'm so sorry. If you look at the appendix at A163, at column 3, for example, and it's taught in column 4 as well, if you look around line 35, it would say the device can be placed on the floor adjacent to furniture or other objects to intercept the crawling arthropods. And in column 4, again, it says that at line 39, the intercepting device can be placed on the floor or ground adjacent to an object. So all the claim requires is that central space G, or something falling within the scope of these claims, be capable of receiving a furniture leg. So you would interpret the language of Claim 1, which reads, in part, support leg receiving receptacle as not meaning that the support, that the receptacle has to be supporting a leg, but only capable of supporting a leg, and it could be used in any other context. Yes, that's what the board found. You would infringe Claim 1 even if there were no leg in the room. If you just had a structure that had the internal section as well as the outer trap, that would be enough to infringe. I would answer that in two ways. The first is that's the way the board construed it, and secondly, that's the way that it makes sense as far as an infringement context is concerned. And that's because if you're selling these traps, you're not also going to be selling the furniture leg. You're not doing that. And so if you want to embrace an accused infringer, you want to be able to snare someone for direct infringement. And in order to do that, they're not going to be selling the furniture leg with their accused device. No, but you could imagine a situation where, and maybe this claim does or doesn't read on that, but you could imagine a Patent D writing the claim to require the presence of the leg in order to get around prior art, perhaps, or perhaps anticipating that that's the only sensible use, and therefore you'd be inducing infringement if you said, here's the best way to use the trap. So, I mean, it doesn't seem to me impossible to imagine, to read this language to suggest that the leg has to be there. But your contention is that's not the way the board is reading the language. Well, I think that's an overly narrow reading, especially since the claims state that aren't just limited to a furniture leg. They're a furniture leg or other object, which is, that's a huge genus, or other object. There's no, I mean, if you look at the specification of examples of other objects, it could be a bed, sofa, chair, kitchen appliances, a walker, a wheelchair, wheels parked on devices, computers, TV, stereos, electronic devices, or other equipments. I mean, this is a whole lot of things that the claim device could have inserted into the first pitfall trap, or could be placed near, because, again, that language is listed in the specification in column four, alongside the language where we're talking about something being just adjacent to. So while that might be a reasonable reading, the board's reading is also reasonable, and for that reason, should be entitled to some deference. And we're still in the universe in which brought us reasonable interpretation. Yes, we are. Yes, we are. Although, I think we would still have a winning case if we were under the district court plan construction standard. Do your honors have any questions related to these other issues? I would just like to, there was one thing that I did also want to point out in response to this notion of bait-free. And that is that Generich's claim one does not require bait. And Generich expressly teaches that bait is not part of his invention. A person of ordinary skill in art would still be motivated to make central space G's walls smooth with or without bait. So that any insect reaching that, either coming down from a furniture leg or making it over the bodies of other bugs to get to central space G, would similarly be trapped in this deep cavern with a narrow bottom. Thank you. Mr. Lunderman, before you get into your rebuttal, I just want to make sure that you and Ms. Kelly are on the same page with respect to the scope of claim one. Do you believe that claim one is infringed by the trap itself irrespective of whether it happens to be used with a leg at a particular time? Or do you think that the leg has to be present in order for claim one, the bed leg or whatever, in order for claim one to be infringed? Your Honor, I guess I do agree with her. We do not feel that the leg has to be present. But what we do say is that support leg receiving characteristic is an affirmative description of the structure of the bed. That is a requirement, and that is not found in any of the prior art. None of the prior art talks about putting this trap under a bed leg. That only comes by way of hindsight from the 973 patent. Go ahead. Thank you. It's a structural requirement, I think, in order for infringement. But the leg, no, it doesn't have to be there in order to be. The other thing, I'm not sure whether I heard Ms. Kelly properly saying that generich in one embodiment doesn't require a bait. I'm not sure whether that was correct or not. But generich is a baited trap. You take the bait away from generich. There's nothing to attract the insects to cause it to go into the trap and get captured in its capturing space. Well, your friend seemed to imply, she said, and your patent seems to say, that if humans are within a few feet, they act as bait even if they're not little tiny humans right in the middle of the trap. I don't quite see that because in order for the generich trap to operate and be effective in capturing the insects, it doesn't have to be bed bugs or any type of insects, they have to fall into the catching space, the catching space K. And the mere fact they're in that area and there may be something attracting the insects to that area doesn't get them into the capturing space. And therefore we think that the limitation of the bait is in fact mandatory in either an embodiment of the generich trap. He's got the bait receptacles in both figure one and figure five. I think that's the end of my time. Thank you. We thank both sides and the case is submitted.